## TOWN OF CLINTON vs. TOWN OF WESTBROOK.

A satisfied mortgage not discharged of record is not an incumbrance within the meaning of the statute, (Gen. Stat., tit. 50, ch. 1, sec. 4,) which provides that a settlement may be gained by an inhabitant of another town in this state if "he shall have been possessed, in his own right, in fee, of real estate of the value of one hundred dollars, free from any incumbrance, in the town to which he may have removed, for the term of one year during his continuance therein."

ASSUMPSIT for supplies furnished to a pauper; referred by the Superior Court to a committee who found the following facts:

The pauper, Jane E. Thompson, for the support of whom this action is brought, is the widow of Daniel Thompson. Daniel Thompson was born in Durham, in this state, in the year 1811. In 1835 he married Jane E. Thompson, with whom he lived in Durham until 1842, when they removed to

VOL. XXXVIII.—2

the town of Westbrook, where they resided till 1852. It is conceded that they acquired a settlement in the town of Westbrook. March 15th, 1852, they removed to Durham and bought a small farm there of Joel Curtis, for the sum of $850, (which was its fair value,) of which Thompson received a deed, and paid as a part of the consideration thereof, the sum of fifty dollars. April 1st, 1852, Thompson gave his note for the balance of the consideration, $800, payable on demand with interest annually. On the 5th day of June following he mortgaged the premises in the usual form to Curtis, to secure said note. The mortgage deed and the deed from Curtis to Thompson were recorded June 5th, 1852.

In July, 1852, Thompson paid on the note in two payments, the sum of $650, and on the first day of June, 1854, he paid the balance; but there was no discharge of the mortgage on the records until May 25th, 1855, when a quit claim deed from Joel Curtis to Jane E. Thompson, was executed and recorded, Daniel Thompson being then deceased.

On the 8th day of May, 1854, the dwelling house on the farm occupied by Thompson burned down. He then went with his family into another house in Durham called the Lucas house; but in consequence of its unsuitable condition he left it about the first of September following and moved into a house in the neighborhood just over the line in the town of Wallingford. It was not their intention or purpose, however, to make Wallingford their permanent residence. They went there for a temporary purpose and as a matter of convenience, intending to reside there only so long as it might be necessary to fit and prepare one of the outbuildings on the farm in Durham for a residence, which was done during that fall and winter, and into which the family moved about the first of April, 1855.

On the 13th day of September, 1854, Daniel Thompson died in Wallingford. He left a will, in and by which he devised and bequeathed all his property to the said Jane E. except a pecuniary legacy of $100 to his daughter. The will was approved by, and the estate was settled in, the Court of Probate for the district of Middletown. Durham is in the

Middletown probate district, but Wallingford is not. The estate consisted of said real estate appraised at $600, and personal property appraised at $254, making in the aggregate $354. The estate was appraised at its fair value.

The legacy, debts and expenses of settling the estate amounted to the sum of $120.43, leaving the real estate and $133.57 in personal property to be distributed to Jane E. Thompson under the provisions of the will. The legacy, debts and expenses were all paid prior to September 10th, 1855, on which day the administration account was settled, and the settlement of the estate closed.

Jane E. Thompson continued to reside on the farm until January 19th, 1856, when she sold it and removed therefrom, but resided in Durham till April 1st, 1856. It was conceded that she did not acquire a settlement therein by virtue of six years continuous residence, and that she has not since that time acquired a settlement in any other town—it being agreed that her settlement is either in the town of Westbrook or in the town of Durham.

The Superior Court accepted the report of the committee, and reserved the question what judgment ought to be rendered for the advice of this court.

*Culver* and *Chadwick*, for the plaintiff, cited *Smith* v. *Vincent*, 15 Conn., 1 ; *Warner* v. *Middlesex Mutual Assurance Co.*, 21 id.,449 ; *Lockwood* v. *Crawford*, 18 id., 371 ; *Culver* v. *Parish*, 21 id., 408 ; *Nevins* v. *Townsend*, 6 id., 5 ; *Town of Sterling* v. *Town of Plainfield*, 4 id., 114 ; *Town of Lebanon* v. *Town of Hebron*, 6 id., 45 ; *Town of Huntington* v. *Town of Oxford*, 4 Day, 189.

*R. D. Smith* and *Tyler*, for the defendant, cited *Town of New Milford* v. *Town of Sherman*, 21 Conn., 101 ; *Town of Salem* v. *Town of Lyme*, 29 id., 74 ; *First National Bank of New Haven* v. *Balcom*, 35 id., 351 ; *Easterly* v. *Goodwin*, id., 279 ; *Mills* v. *Shepard*, 30 id., 98 ; *Savage* v. *Dooley*, 28 id., 411 ; *Burr* v. *Spencer*, 26 id., 159 ; *Porter* v. *Seeley*, 13 id., 564 ; *Clark* v. *Beach*, 6 id., 142, 158, 164 ; *Town of Barkhamstead* v. *Town of Farmington*, 2 id., 600.

CARPENTER, J.  The question in this case arises under the statute, (tit. 50, ch. 1, sec. 4,) which provides that a settlement may be gained by an inhabitant of another town in this state "if he shall have been possessed, in his own right, in fee, of real estate of the value of one hundred dollars, free from any incumbrance, in the town to which he may have removed, for the term of one year · during his continuance therein."

The plaintiff claims that the pauper gained no settlement in Durham for two reasons ; first, that there was not such a residence or continuance therein, for the term of one year while owning real estate, as the statute contemplates ;—and, secondly, that the real estate owned during that time was not free from incumbrance.  The liability of the defendant is conceded unless the pauper gained a settlement in Durham.

1.  As to residence.  It is obvious from the report of the committee, that the pauper and her husband, Daniel Thompson, did not intend by their temporary residence in Wallingford to change their domicil.  Their dwelling house had been consumed by fire.  They commenced the construction of another ; meanwhile their necessities compelled them to seek shelter in a neighboring house, which happened to be in Wallingford.  But it was not their intention to make that their home.  They intended to retain their domicil in Durham.  There was all their property, except what was needed for their present wants.  There they intended to return as soon as a suitable house could be provided for them ; and there the pauper did return, the husband having died while in Wallingford.  His will was proved and his estate was settled in the probate court for the district of Middletown, which could not have been legally done if his residence, at the time of his death, had been in Wallingford.  That shows the intention of the parties, and in cases of this character that is the all important consideration.  Where that is manifest, the law usually gives effect to it by allowing the party to select the place of his own domicil.  There seems to be no more occasion to hold that the temporary occupancy by these parties of a house in Wallingford interrupted their legal residence in

Durham, than there would be to hold that a citizen of one of our cities who occupies his own cottage by the sea side or in a country town, during the summer months, thereby changes his residence. The *animus revertendi* exists in either case, and controls the legal consequences of the act. We are therefore of the opinion that the pauper's legal residence was in Durham, from the time she first went there in 1852, until after April, 1856.

2. Was there any incumbrance on the real estate owned by her, from September, 1854, the time of her husband's death, to January 1856, when she sold the property? It is claimed that the mortgage deed given by Daniel Thompson in 1852, and discharged of record May 25th, 1855, was an incumbrance until so discharged, notwithstanding the debt secured thereby was paid June 1st, 1854. A mortgagee holds the legal title solely as a means of enforcing payment of the mortgage debt. For all other purposes the mortgagor is regarded as the owner. When the debt is satisfied, if the legal title is then vested in the mortgagee, he holds it in trust for the mortgagor. It is his duty to reconvey and he may be compelled to do so. Inasmuch as the legal title is in him, he may defend, on that ground, an action of ejectment brought against him by the mortgagor. *Smith* v. *Vincent.*, 15 Conn., 1. The reason given is that the parties may have this inducement to cause a satisfied mortgage to be discharged, so that the record may disclose the true state of the title.

It has also been decided that the title of a mortgagor, with an outstanding mortgage title, the mortgage debt having been paid after the law day, did not answer the requirements of the charter of a Mutual Fire Insurance Company that an applicant for insurance should have a good and perfect title to the property insured. *Warner* v. *The Middlesex Mutual Assurance Co.*, 21 Conn., 444.

These two cases seem to be exceptions to the rule that the mortgagor is to be regarded as the owner of the property subject to the rights of the mortgagee to enforce payment of his debt by means of his title. The first is founded on reasons of policy; the second on the express provisions of the charter

of the insurance company in which both parties were interested, and which was a part of the contract between the parties. In that case also the party seeking to avail itself of the outstanding mortgage had an interest in the property, and was directly affected by the mortgage. We are not aware of any case in which a mere stranger to the mortgage and the title has been permitted to take advantage of the mortgage, either as a cause of action or as a ground of defense. There are several cases in which it has been unsuccessfully attempted. *Porter* v. *Seeley,* 13 Conn., 564; *Burr* v. *Spencer,* 26 Conn., 159; *Savage* v. *Dooley,* 28 Conn., 411.

The parties to this action are not parties to the mortgage; nor have they or either of them any interest therein or in the title. Neither of them can be affected by the mortgage except so far as the statute has made it material to the question of settlement. It is material only so far as it is an incumbrance. It is an incumbrance to the extent of the debt or duty secured thereby. When the debt is paid or duty discharged the incumbrance ceases to exist. A satisfied mortgage is not an incumbrance within the meaning of this statute. It may be a cloud upon the title, but that is not necessarily an incumbrance. Where, as in this case, it is without force as between the parties, except to a very limited extent, and where strangers cannot be permitted to take advantage of it, we do not hesitate to hold that it is not an incumbrance.

The argument that in order to gain a settlement under this statute a party must have a perfect record title cannot be maintained. The statute does not require it. It only requires that he shall be possessed, in his own right, in fee. A man may have title by inheritance without distribution, or by prescription. In either case he has no record title, and yet his title may be good. It will be more difficult to prove it, but when proved it must be followed by the same legal consequences. So of property subject to a mortgage; the record frequently fails to show the true state of the title. The debt secured should in the first instance be correctly described, and that appears on the record. But subsequent changes by partial payments do not appear; and even where the payment is

in full, the record does not always show it.    If the debt was paid on or before the law day, the title does not vest in the mortgagee and there is no necessity for a release deed.    Such a payment cannot be ascertained from a mere inspection of the record.    Inquiry *dehors* the record is necessary.    The parties do not contend that a mortgage thus paid would be an incumbrance.

We think therefore that the statute does not contemplate a perfect record title, and that an incumbrance which will operate to prevent the acquisition of a settlement must be an actual incumbrance as distinguished from one on paper merely.

It was further claimed that the creditors of Daniel Thompson, and the legatees under his will, had a lien on the real estate for their debts and legacies, and that that was an incumbrance upon it.    The sum total of all the debts, legacies and expenses of settling the estate, was considerably less than the personal property, so that, in point of fact, there was no incumbrance on the real estate.    Whatever incumbrance existed, was contingent upon the personal property being insufficient to pay said claims.    That contingency never happened and the incumbrance never attached.

For these reasons we advise the Superior Court to render judgment for the defendant.

In this opinion the other judges concurred; except FOSTER, J., who did not sit.